## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| **TRACEY GRISSOM,** | ) |
| **(AIS #296141)** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CASE NO. 2:19-cv-00420-RAH** |
| | ) |
| **CORIZON, LLC, et. al.;** | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

For her Second Amended Complaint, Tracey Grissom, brings this action for prospective injunctive relief, compensatory and punitive damages, attorneys' fees, expenses, and costs, and such other and further relief as the Court deems appropriate, for violations of her federally protected rights as made actionable pursuant to 42 U.S.C. § 1983.  In support of her claims, Plaintiff states:

### THE PARTIES

1.      Stacey Grissom is a woman over the age of 21 years.

2.      When this action was filed, Grissom resided in the Julia Tutwiler Prison for Women ("Tutwiler") in Wetumpka, Alabama.

3.      Corizon is that entity named Corizon, LLC, or such other entity known as Corizon, that employed doctors, nurses, and/or other staff to provide medical care to the inmates at Tutwiler prior to April 1, 2018.

4.      David Gams, M.D., is a natural person over 21 years of age.

5.      Dr. Gams is a physician who worked at Tutwiler while Plaintiff was an inmate.

6.      Dr. Gams was an employee of Corizon.

7.      Dr. Gams resides within the Middle District of Alabama.

8.      Dr. Gams is sued individually and in his official capacities.

9.      Wanda Manuel ("Manuel") is a natural person over 21 years of age.

10.     Manuel was an employee of Corizon.

11.     Manuel resides within the Middle District of Alabama.

12.     Manuel is a nurse who worked at Tutwiler while Plaintiff was an inmate.

13.     Manuel is sued individually and in her official capacities.

14.     Linda Gilchrist is a natural person over 21 years of age.

15.     Gilchrist was an employee of Corizon.

16.     Gilchrist resides in the Middle District of Alabama.

17.     Gilchrist was a nurse who worked at Tutwiler while Plaintiff was an inmate.

18.     Gilchrist is sued individually and in her official capacities.

19.     Linda Jackson ("Jackson") is a natural person over the age of 21 years.

20.     Jackson resides within the Middle District of Alabama.

21.   Jackson was an employee of Corizon.

22.   Jackson is a nurse who worked at Tutwiler while Plaintiff was an inmate.

23.   Jackson is sued individually and in her official capacities.

24.   Yvette Young ("Young") is a natural person over the age of 21 years.

25.   Young resides within the Middle District of Alabama.

26.   Young was an employee of Corizon.

27.   Young worked at Tutwiler while Plaintiff was incarcerated.

28.   Young is sued individually and in her official capacities.

29.   Brian Coleman ("Coleman") is a natural person over the age of 21.

30.   Coleman resides within the Middle District of Alabama. Coleman was an employee of the Alabama Department of Corrections (the "Department") at Tutwiler while Plaintiff was incarcerated.

31.   Coleman is sued individually and in his official capacities.

32.   Sam Gordon ("Gordon") is a natural person over the age of 21.

33.   Gordon resides in the Middle District of Alabama.

34.   Gordon was an employee of the Department at Tutwiler while Plaintiff was incarcerated.

35.   Gordon is sued officially and in his individual capacities.

36.   Cynthia Stewart ("Stewart") is a natural person over the age of 21.

37.     Stewart resides in the Middle District of Alabama.

38.     At all times relevant, Stewart served as the Warden of Tutwiler Prison while Plaintiff was incarcerated.

39.     Stewart is sued officially and in her individual capacities.

40.     Jefferson S. Dunn ("Dunn") is a natural person over the age of 21.

41.     Dunn resides in the Middle District of Alabama.

42.     Dunn served as the Commissioner of the Department while Plaintiff was incarcerated.

43.     Dunn is sued in his official capacity only.

44.     The Department is the agency charged with providing humane confinement consistent with the federally protected rights of all persons imprisoned by the State of Alabama.

## JURISDICTION AND VENUE

45.     This is an action brought pursuant to the Enforcement Acts, as codified at 42 U.S.C. § 1983, the Americans with Disabilities Act, as codified at 42 U.S.C. § 12101, and the Rehabilitation Act of 1973, as codified at 29 U.S.C. § 701, *et seq*.

46.     Plaintiff also brings claims pursuant to the laws of the State of Alabama.

47.     This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

48.     This Court has supplemental jurisdiction of Plaintiff's State law claims pursuant to 28 U.S.C. § 1337.

49.     Venue in this action is appropriate in the Middle District of Alabama pursuant to 28 U.S.C. § 1391(b).

## FACTS

50.     Plaintiff is a former nurse.

51.     Plaintiff has a degree in Nursing from the University of Alabama (Tuscaloosa).

52.     Prior to her incarceration in Tutwiler, Plaintiff had to have a total colectomy, which caused her to have a colostomy.

53.     Plaintiff eventually received an ileostomy.

54.     Prior to the events described herein, Plaintiff assisted certain parties who were bringing an action against the Alabama Department of Corrections and others over the poor healthcare and other unconstitutional conditions at Tutwiler.

55.     On June 6, 2017, Tutwiler staff transferred Plaintiff to the infirmary because she suffered from kidney stones.

56.     By June 9, 2017, Plaintiff still had not passed her kidney stones.

57.     Prior to June 9, 2017, from the time the Department admitted her to the infirmary, Tutwiler staff dispensed to Plaintiff Tylenol 4 every four hours for pain caused by her kidney stones.

58.    Dr. Gams ordered Plaintiff to remain in the infirmary over the weekend of June 9, 2017.

59.    Plaintiff suffered extreme pain causing her muscles to severely contract.

60.    Neither Dr. Gams, Jackson, Manuel, Gilchrist, nor any other Corizon employee dispensed pain medication to Plaintiff over that weekend, even though she obviously suffered extreme pain and abdominal contractions due to her kidney stones.

61.    Upon information and belief, Gilcrest failed or refused to contact Dr. Gams or anyone else with authority to order pain medication for Plaintiff over the weekend beginning June 9, 2017.

62.    The contraction of Plaintiff's muscles in and around her abdomen caused some of her intestines (among those that remained from her prior surgical procedures) to exit Plaintiff's body through the stoma, or hole, made in connection with her ileostomy.[1]

63.    Plaintiff suffered extreme pain when her intestines herniated through the stoma and remained outside her body.

---

[1] The term "stoma" refers to a surgical procedure in which a doctor creates a hole in the opening of a patient's abdomen for purposes of allowing waste to exit the patient's body, rather than their digestive system. To create a stoma, a doctor will pull part of the patient's large or small intestine on to the surface of the patient's skin and sew it on to an opening in the thoracic cavity, called an "ostomy," allowing waste to empty into an ostomy appliance or bag.

64.     Gilchrist advised Dr. Gams that Plaintiff's intestines had come out of her body and that Plaintiff was in extreme pain, but neither Gilchrist nor any other nurse practitioner employed by Corizon prescribed any pain medication for Plaintiff, even though, upon information and belief, their nurse practitioner collaboration agreements allowed them to do so.

65.     Likewise, Dr. Gams failed or refused to order pain medication for Plaintiff even after being advised of Plaintiff's condition.

66.     Moreover, Dr. Gams failed or refused over that weekend to order that Plaintiff be transported to a hospital.

67.     However, Dr. Gams subsequently acknowledged that the medical staff should have dispensed medication after staff observed Plaintiff's intestines protruding through her stoma.

68.     Over the weekend beginning June 9, 2017, Plaintiff's pain dramatically increased.

69.     Over the weekend, Plaintiff became extremely nauseated and vomited.

70.     Over the weekend, Plaintiff's intestines became swollen and discolored.

71.     However, even after the swelling and discoloration of Plaintiff's intestines, neither Nurse Gilchrist, nor anyone else in the infirmary transferred Plaintiff to a hospital.

72. Instead, Nurse Manuel, who was on duty, advised Plaintiff that Dr. Gams would push Plaintiff's intestines back into her body after he came to work on Monday, because he "got off on that kind of stuff."

73. Because Gilcrest, Manuel, Jackson and Dr. Gams did not cause Plaintiff to be admitted promptly into a hospital, Plaintiff's intestines became necrotic (meaning the cells in the tissue of the organ began to die due to disease, injury, or failure of the blood supply).

74. Gilcrest, Jackson, Manuel, and Dr. Gams' conduct demonstrated intentional and/or reckless indifference to Plaintiff's well-being.

75. During this period, Plaintiff not only suffered severe pain, but literally feared dying, and she cried out to that effect.

76. On Monday, June 12, 2017, Dr. Gams tried unsuccessfully to push Plaintiff's intestines back into her body manually.

77. The attempted procedure by Dr. Gams was performed without anesthesia.

78. The attempt by Dr. Gams to push Plaintiff's intestine back into her body manually proved excruciatingly painful.

79. The attempt by Dr. Gams to push Plaintiff's intestine back into her body manually was medically contraindicated and contrary to common sense available to any layperson.

8

80.     The attempt by Dr. Gams to push Plaintiff's intestine back into her body manually reflected intentional and/or reckless indifference to Plaintiff's well-being.

81.     This attempt by Dr. Gams proved uniquely cruel and unusual.

82.     On June 12, 2017, the Department finally transferred Plaintiff to Jackson Hospital where hospital staff diagnosed her with an intestinal obstruction and necrotic tissue in her intestine and stoma.

83.     On June 12, 2017, Jackson Hospital healthcare providers placed Plaintiff on antibiotics and inserted a tube into her thoracic cavity to drain the intestinal contents that had leaked into it.

84.     On June 14, 2017, Jackson Hospital surgeons resected the bowel to remove the necrotic portion of Plaintiff's intestine and stoma.

85.     During the same surgery of June 14, 2017, the surgical staff also removed the obstructed portion of Plaintiff's intestine.

86.     Plaintiff remained in Jackson Hospital until June 21, 2017.

87.     Upon return to Tutwiler, Plaintiff encountered difficulty with her stoma.

88.     In particular, and without limitation, the stoma was more or less flush with the skin.

89.     The condition of the stoma was such that the ileostomy pouches supplied to Plaintiff would not stay on or otherwise capture the effluent that escaped from the ostomy or hole that was located in the area of Plaintiff's stoma.

90.     As a result, stool regularly came into contact with Plaintiff's skin and caused painful excoriation and irritation on Plaintiff's dermis and epidermis (inner and outer layers of skin).

91.     The seal broke frequently causing Plaintiff to soil her clothes and bedding.

92.     Plaintiff suffered extreme humiliation and emotional distress, as well as physical pain, when these events occurred.

93.     Plaintiff submitted a medical grievance addressing these issues on June 22, 2017.

94.     Plaintiff did not receive a reply to her grievance until November 2017.

95.     According to DOL policy, infirmary staff should have responded to Plaintiff's grievance within 5 to 10 days of her having submitted it.

96.     Nurse Jackson bore direct responsibility for causing Plaintiff to receive an untimely reply to her grievance.

97.     If Nurse Jackson had processed Plaintiff's grievance in a timely fashion, her excoriation and other physical injuries would not have occurred or, if

they occurred, they would have been less severe, such that Plaintiff would have suffered less physical pain, as well as less emotional anguish.

98.   On July 6, 2017, Tutwiler infirmary staff discharged the Plaintiff.

99.   When Tutwiler staff discharged the Plaintiff from the infirmary, they failed or refused to provide her appropriate pouches that would stay on the site of her stoma even though they knew or should have known of appropriate and suitable medical devices for this purpose.

100.   When Tutwiler staff discharged the Plaintiff from the infirmary, a painful open wound, or ostomy, remained on the side of Plaintiff's abdomen.

101.   When Tutwiler staff discharged Plaintiff from the infirmary, her stoma still did not rise above the level of her ostomy.

102.   When Tutwiler staff discharged Plaintiff from the infirmary, they reassigned her to the "Medical" dormitory.

103.   The Medical dormitory houses pregnant prisoners and those prisoners with chronic medical conditions.

104.   The prisoners in the "Medical" dormitory do not receive nursing care or close medical observation or supervision.

105.   Upon information and belief, the infirmary staff, and those acting in concert with them, reassigned Plaintiff to the Medical dormitory because she had repeatedly filed grievances.

11

106.   Tutwiler staff should have maintained Plaintiff in the infirmary.  Filing grievances is not a legitimate reason for transferring Plaintiff from the infirmary to the Medical dormitory.

107.   On July 8, 2017, Plaintiff filed another grievance because the pouches provided for her ileostomy were not staying on and because the nurse in the Medical dormitory had advised she was too busy to search for suitable bags.

108.   On July 10, 2017, an inmate named Carbita Kutochoneuter filed an inmate grievance alleging Plaintiff's open wound and continual soiling of herself made Plaintiff's presence very unpleasant, at best.

109.   Tutwiler staff responded to the grievance by moving Plaintiff closer to the bathroom and by providing her bed pads to help keep stool off the sheets of Plaintiff's bed.

110.   On July 10, 2017, Plaintiff suffered pain, because Plaintiff effectively had no stoma, and because the pouches provided to Plaintiff did not fit properly and would not stay in place. Nurse Carter and Nurse Jackson made Plaintiff sign a waiver.

111.   Plaintiff was not seen by Dr. Gams until July 21, 2017.

112.   In response to a grievance filed by Plaintiff, Nurse Chappel replied that Plaintiff had left the infirmary before being seen: that reply was false.

113.   On July 21, 2017, Dr. Gams prescribed Lidocaine gel for the pain/excoriation around the stoma area.

114.   Lidocaine was not an appropriate treatment for the excoriation on plaintiff's skin.

115.   Dr. Gams ordered a therapeutic diet for Plaintiff, so that some of the foods served to her would be ground (mechanical soft diet).

116.   The stewards at Tutwiler refused to prepare a mechanical soft diet for Plaintiff.

117.   On July 22, 2017, Plaintiff filed a complaint with Tina Tyler, the coordinator for compliance with the Americans with Disabilities Act at Tutwiler. Her grievance complained of the staff's failure to provide pouches that remained in place and the Tutwiler stewards' refusal to prepare a therapeutic diet as ordered for Plaintiff by Dr. Gams.

118.   On July 28, 2017, Plaintiff filed a grievance about the fact that Nurse Chappel had reported that Plaintiff had left the healthcare unit without seeing Dr. Gams on July 21, 2017, when, in fact, Plaintiff had seen Dr. Gams.

119.   Plaintiff filed the grievance on July 28, 2017, in part because she did not want her medical records to indicate that she had refused to cooperate with her medical treatment, such as it was, and also to complain about the improper record keeping practices at Tutwiler, so that such practices and records might be corrected.

120.  On July 30, 2017, the laundry attendant refused to accept Plaintiff's clothing for laundering.

121.  It is against the rules at Tutwiler for a prisoner to launder her own clothing.

122.  Plaintiff notified the Department's Lieutenant Brian Coleman about the situation with her laundry and the humiliation she suffered as a result.

123.  Lieutenant Coleman retaliated against Plaintiff by doing nothing, even though it was Coleman's job to do something in light of the open and obvious cruel and unusual treatment that Plaintiff was suffering, and that Coleman could and did readily observe.

124.  On August 14, 2017, Plaintiff met with Tina Tyler (ADA Director for Tutwiler) ("Tyler").

125.  Tyler refused to take any action regarding Plaintiff's problems in getting the steward to provide a diet consistent with Dr. Gams' orders.

126.  Tyler further failed or refused to take any action regarding the pouches necessary for Plaintiff's ileostomy.

127.  On August 15, 2017, Plaintiff filed additional medical grievances regarding the failure to receive the therapeutic diet that Dr. Gams had ordered and the failure to receive pouches that would remain in place.

128.   On August 23, 2017, Plaintiff filled out a sick call because she was in excruciating pain from a swollen area located under the bag and also because of excoriation under the bag, because the bag kept coming off daily, such that acids contained in her stool were burning her skin.

129.   Due to pouches coming off, pain, and excoriation, Plaintiff was in extreme pain, such that she had to limit movement as much as possible.

130.   Notwithstanding the pain that Plaintiff endured, Dr. Gams stopped the prescription for Lyrica previously prescribed for Plaintiff. [2]

131.   No evidence exists suggesting Plaintiff ever abused Lyrica.

132.   No evidence exists suggesting Plaintiff shared Lyrica with anyone, much less inmates or staff.

133.   On August 29, 2017, Dr. Gams examined Plaintiff for complaints of pain, excoriation, and pouches failing to stay in place.

134.   Dr. Gams advised the staff that they increase Plaintiff's Elavil dosage, but in fact they decreased the dosage, such that Plaintiff's pain worsened.[3]

135.   Dr. Gams referred Plaintiff to Gayle Moore, the wound care nurse for the Department.

---

[2] Lyrica is prescribed to treat nerve pain.
[3] Elivil is an antidepressant used to treat Major Depressive Disorder.

15

136. Nurse Practitioner Moore advised that Plaintiff needed to have surgery to repair Plaintiff's stoma and to have contoured (or convex) pouches for Plaintiff's ostomy to minimize excoriation.

137. On September 5, 2017, Plaintiff completed an inmate grievance form because there were no medical grievance forms available. Plaintiff submitted this grievance to complain about the Department's failure to prescribe and dispense Elavil. Plaintiff deposited the inmate grievance form into the medical grievance box.

138. Plaintiff did not receive Elavil until October 2, 2017.

139. On September 7, 2017, Plaintiff spoke to Lieutenant Young to request assistance with addressing her medical needs, including painful excoriation and Plaintiff's failure to obtain pouches as directed by Nurse Practitioner Moore.

140. Plaintiff did not receive a response to this medical grievance until November 2, 2017.

141. Young's failure to take prompt action despite having personally observed Plaintiff's suffering was itself a violation of the Eighth Amendment.

142. On September 13, 2017, Plaintiff placed another sick call based on her materially worsening condition.

143. Dr. Gams had ordered a therapeutic diet for Plaintiff.

144. This diet included such things as ground food.

16

145.   More often than not, however, the Stewards at Tutwiler failed or refused to prepare Plaintiff's food as directed by Dr. Gams.

146.   On September 15, 2017, Plaintiff met with Jessica Pritzer, a nutritionist at the Department, about the Stewards failing to prepare or to cause others to prepare Plaintiff's food as directed by Dr. Gams.

147.   In the meeting with Pritzer on September 15, 2017, Plaintiff agreed that all her foods should be mechanically ground.

148.   On September 15, 2017, Nurse Carter examined Plaintiff because of Plaintiff's condition, including her excoriation.

149.   Plaintiff complained to Nurse Carter on September 15, 2017, about not having deep contour (aka convex) pouches for her ileostomy.

150.   Nurse Carter directed Plaintiff to sign a waiver stating that Dr. Gams was aware of the issue, but Plaintiff refused to sign the waiver.

151.   On September 26, 2017, Dr. Gams examined Plaintiff, but the examination was interrupted by a fire drill.

152.   Dr. Gams did not address Plaintiff's problems on September 26, 2017, which problems included excoriation sores, the lack of deep contour (aka convex) pouches, and a problematic or total lack of stoma.

153.   On October 2, 2017, Plaintiff filed a grievance because her examination begun on September 26, 2017, had not been completed and because her medical problems had not been addressed.

154.   On October 2, 2017, Plaintiff remained in horrible pain, which limited her activity.

155.   On October 7, 2017, Plaintiff filed another grievance because the Stewards did not follow or cause others to follow Dr. Gams' directions when preparing Plaintiff's diet.

156.   Defendants' refusal to prepare Plaintiff's food as directed by Dr. Gams was motivated by a desire to retaliate against Plaintiff because Plaintiff had filed grievances.

157.   On October 10, 2017, Plaintiff filed another ADA complaint because she had not received deep contour (aka convex) ileostomy bags.

158.   By this time (i.e., October 10, 2017), Plaintiff had been the victim of months of intentional, willful indifference to her medical needs.

159.   On October 12, 2017, ADA Director Tina Tyler advised Plaintiff that Director of Nursing Jackson had ordered deep contour (aka convex) pouches for Plaintiff's ostomy.

160.   On October 12, 2017, ADA Director Tina Tyler also advised Plaintiff that she (Tyler) was sending orders to the kitchen to ensure that Plaintiff's diet conformed to the therapeutic requirements previously prescribed by Dr. Gams.

161.   On October 28, 2017, Plaintiff's Elavil prescription was not reordered, such that Plaintiff was left to endure excruciating pain without any pain medication.

162.   Plaintiff filed a medical grievance about the lack of response she had received to her previously submitted medical grievances.

163.   On November 2, 2017, Plaintiff wrote Commissioner Wendy Williams about not having a stoma, about the necessity of having the stoma surgically repaired per the recommendation of the wound nurse (Gayle Moore), her excoriation sores, her inability to be active, her failure to receive the therapeutic diet prescribed by Dr. Gams, and the resulting pain Defendants made Plaintiff endure.

164.   On November 3, 2017, Plaintiff filed a grievance regarding Stewards Davis and Crosby for refusing to follow dietary orders given by Dr. Gams and nutritionist Pitzer, which orders were further required by ADA Coordinator Tina Tyler.

165.   On November 6, 2017, Plaintiff filed another ADA complaint about not receiving food prepared as required by Dr. Gams. The complaint also addressed Plaintiff's excoriation sores and the failure to have her stoma surgically repaired.

19

166.   On November 7, 2017, Petitioner received a letter from Commissioner Williams who said she would look into Plaintiff's medical problems.

167.   By the time she received the correspondence from Commissioner Williams, Plaintiff had still not received the deep contour (aka convex) pouches prescribed by wound care nurse Gayle Moore.  Plaintiff was still soiling herself daily and Plaintiff's excoriation sores were worsening.  Plaintiff suffered terrible pain and could do little but lie in bed in the hope of keeping the ill-fitting pouches from falling off.

168.   On November 14, 2017, Dr. Gams, Director of Nursing Jackson, HSA Love, Chief Gordon, Mental Health Counselor Derrick Menorah, and Captain Goodson summoned Plaintiff to a round-table meeting.

169.   At the round table meeting, Gams, Jackson, Love, Menorah and Goodson informed Plaintiff that she would be scheduled for surgery and placed back on the pain medication Lyrica.

170.   On November 18, 2017, Plaintiff filed another grievance because Steward Davis still failed or refused to provide or cause others to provide the diet prescribed by Dr. Gams and the Department's Nutritionist.

171.   On November 30, 2017, Plaintiff filed a grievance because she had still not received the deep contour (aka convex) pouches that the wound care nurse, Gayle Moore, had prescribed some months before.

20

172.   Nurse Moore advised Plaintiff that the convex poaches were ordered.

173.   No reason exists why the correct pouches could not have been ordered from another supplier.

174.   On December 6, 2017, Plaintiff placed a sick call about the painful excoriation that she was continuing to endure. Her skin was bursting and bleeding, her pouches could not remain in place, and she routinely soiled herself.   She continued waiting for the promised surgery.

175.   On December 9, 2017, Plaintiff presented to health care to obtain more pouches for her ileostomy.

176.   The nursing staff treating Plaintiff personally observed Plaintiff's excoriation and resulting discomfort, all caused by leakage from ill-fitting pouches, during her visit on December 9, 2017.

177.   Tutwiler staff placed Plaintiff in solitary confinement.

178.   Upon Information and belief, Tutwiler staff placed Plaintiff in solitary confinement because she filed multiple grievances.

179.   Upon information and belief, Tutwiler staff placed Plaintiff in solitary confinement because she continually requested proper medical supplies.

180.   Nurse Manuel directly caused Plaintiff to be placed in solitary confinement.

181.   No legitimate, non-retaliatory reason exists explaining why Nurse Manuel ordered Plaintiff to be placed in solitary confinement.

182.   Indeed, Nurse Manuel actually admitted that she placed Plaintiff in solitary confinement because she had filed grievances.

183.   This comment was overheard by Joyce Lowe, Deborah Putman, and Ruth Chambers, all of whom reported the comment to authorities.

184.   While in solitary confinement, no medical personnel other than those who dispensed medication (these workers did not examine Plaintiff or otherwise assess her condition) examined her.

185.   All of the persons (other than, of course, Plaintiff) who attended the roundtable meeting of November 14, 2017, were first-hand observers of Plaintiff's suffering and mistreatment.  Yet, none of them promptly intervened, despite their legal, ethical and moral obligation to take prompt remedial action.

186.   The mistreatment recounted in this Amended Complaint caused Plaintiff to suffer significant anxiety and depression, mental anguish and emotional distress, as well as excruciating outright physical pain.

187.   The Plaintiff suffered significant post-traumatic stress disorder from the treatment, or lack thereof, provided by the Department and its staff.

188.   In February 2018, the Department sent Plaintiff to a surgeon at St. Vincent's Hospital in Birmingham to have her stoma surgically corrected.

189.   The surgeon at St. Vincent's hospital only corrected the existing stoma: the surgeon recommended additional surgery.

190.   On July 18, 2017, the Department discontinued dispensing Plaintiff's Lyrica medication.

191.   The acts and omissions recounted herein amount to intentional indifference.

192.   The acts and omissions recounted herein amount to willful neglect.

193.   The acts and omissions recounted herein amount to reckless indifference.

194.   The acts and omissions recounted herein represent the results of the policies and procedures adopted, ratified or condoned by Defendant Corizon.

195.   The acts and omissions recounted herein represent the results of the policies and procedures adopted, ratified or condoned by the Department.

196.   The acts and omissions described herein represent the results of policies, procedures, and practices (including omissions) by Dunn.

197.   Lieutenant Young served as the grievance officer employed by ADOC during the period recounted herein.

198.   When the Tutwiler staff discontinued Plaintiff's pain medication while she suffered from abdominal contractions associated with passing kidney stones, the

discontinuation was so contraindicated as to be obviously wrong and harmful, even to a layperson, especially given Plaintiff's ileostomy.

199.   The failure to provide Plaintiff appropriate ileostomy pouches was so mistaken as to be obviously wrong even to a layperson, especially given the continual leakage from the pouches provided her,  the excoriation that she suffered as a result, and the direct orders from the nurse practitioner who was the ostomy nurse for the entire Department.

200.   The failure to provide Plaintiff with the appropriate therapeutic diet was so mistaken as to be obviously wrong even to a layperson, especially given the direct written orders provided by her attending physician and the repeated discussions of the need for that diet in various meetings.

201.   When Tutwiler Staff transferred Plaintiff from the infirmary to the Medical dorm, that transfer was so mistaken as to be obviously wrong even to a layperson, especially given Plaintiff's continued leakage from her ostomy wound, her excoriation, and her pain; indeed, the utterly wrongful character of that transfer became the subject of at least one grievance filed by another prisoner.

202.   When Tutwiler staff placed Plaintiff in "isolation," that placement was so mistaken as to be obviously wrong even to a layperson, given that Plaintiff needed medical attention, not isolation.

203.   When the Plaintiff's medical needs were willfully ignored or only belatedly attended to as recounted herein, those acts and omissions were so mistaken as to be obviously wrong even to a layperson.

204.   The wrongs inflicted on the Plaintiff were inflicted in retaliation for her previous complaints about problems with healthcare services at Tutwiler in connection with a judicial proceeding.

205.   Defendants denied pain medication to Plaintiff because she previously submitted grievances.

206.   Defendants denied Plaintiff a transfer to the hospital when her intestines came out because she previously submitted grievances.

207.   Defendants denied Plaintiff appropriate ileostomy pouches because she previously filed grievances.

208.   Defendants transferred Plaintiff from the infirmary to the medical dormitory because she filed grievances.

209.   Defendants placed Plaintiff in isolation because she filed grievances.

210.   Defendants denied Plaintiff her medically prescribed diet because she filed grievances.

211.   Defendants mistreated Plaintiff as recounted herein because she cooperated with the Southern Poverty Law Center in that organization's

representation in an action pressing for improvement in the conditions of prison confinement in Alabama.

212.   After the Court declined to dismiss this action, Defendants made Plaintiff the subject of retaliation because she pressed this action. In particular, her ileostomy pouches have not been distributed as required, i.e., four at a time.

213.   The operators of the Alabama Therapeutic Education Facility ("ATEF"), as well as Dr. Gams, Corizon, and other persons identified herein (other than the stewards, Lieutenant Coleman, and ADA Director Tyler), are not State officials entitled to qualified immunity, but are instead simply employees of private companies.

214.   However, the persons employed by private companies, at all times relevant herein, acted under color of state law.

215.   Dr. Gams was the de facto corporate policy maker for Corizon.

216.   Corizon adopted a written policy and/or procedure or, alternatively, a pattern, practice, or custom authorized, ratified and condoned by a final policy-maker so as to rise to the level of a written policy, of ignoring the medication needs of inmates and the need for hospitalization in order to maximize corporate profits by reducing expenses.

217.   Corizon adopted a written policy and/or procedure or, alternatively, a pattern, practice, or custom authorized, ratified and condoned by a final policy-

maker so as to rise to the level of a written policy, of ignoring the hospitalization needs of inmates in order to maximize profits.

218.   Corizon adopted a written policy and/or procedure or, alternatively, a pattern, practice, or custom authorized, ratified and condoned by a final policy-maker so as to rise to the level of a policy, of ignoring the hospitalization needs of inmates in order to retain the business of the Department.

219.   Corizon failed to train Dr. Gams, Gilchrist, Manuel, and Jackson adequately regarding when to send prisoners to the hospital.

220.   Corizon failed to train Dr. Gams, Gilchrist, Manuel, Jackson and Young adequately regarding the other duties as described herein.

221.   The law imposed upon Dr. Gams a duty to supervise Gilchrist, Manuel, and Jackson, but he failed to discharge that duty, such that Corizon is not only liable under the doctrine of respondent superior, but also such that he is individually liable in his own right for the wrongs he and his subordinates committed against Plaintiff because he failed to supervise them appropriately.

222.   The acts and omissions of Gilchrist, Manuel, and Jackson as recounted herein were negligent.

223.   The acts and omissions of Gilchrist, Manuel, and Jackson as recounted herein were wanton.

224.   The acts and omissions of Gilchrist, Manuel, and Jackson as recounted were committed with deliberate indifference to Plaintiff's federally protected rights.

225.   The acts and omissions, as recounted herein, of each of the Defendants caused Plaintiff to suffer actual physical injury, as well as emotional injury.

226.   Plaintiff is now a prisoner at the ATEF, which is operated by GEO U.S. Secure Services ("GEO"), which maintains a principal place of business in Columbiana, Alabama.

227.   While ATEF is still a prison in every sense of the word, Plaintiff does not allege that the conditions of confinement at GEO are unconstitutional: the only potential present exception to this statement would involve the medical care at GEO, but Plaintiff does not presently believe that GEO is responsible for providing that care and Plaintiff has only very recently been transferred to ATEF.  In any event, the only exception at present at GEO would concern the failure by the Department to provide Plaintiff a sufficient number of ileostomy pouches.  The GEO staff at ATEF are very firm, but professional.

228.   Notwithstanding the professionalism of the staff at GEO (e.g., the lack of cruelty, etc.), the fact is that women at ATEF and also at facilities operated by the Department receive educational opportunities that are remarkably inferior to those received by men.

229.   For example, if a woman, such as the Plaintiff, receives one hour of educational instruction, a man studying the same subject would receive several hours, perhaps even as many as eight.

230.   While Plaintiff is not personally acquainted with the instruction offered to men at facilities operated by ADOC, upon information and belief, she believes that the instruction offered to men at those facilities is generally better (not only in terms of breadth and number of hours, but in terms of the quality of instruction) than that offered to women at facilities operated by ADOC.

231.   The differences between the instruction offered to men and women at ATEF are not attributable to GEO, but are rather attributable to the funding and program directions provided by Commissioner Dunn and other officials who work for the Department.

232.   The Department and the State of Alabama receive a variety of federal funding, not only for education, but for such matters as the prevention of rape in the very facilities where Plaintiff has been and is imprisoned.

233.   By providing women prisoners with educational opportunities that are markedly inferior to those provided to men, Dunn has violated the law commonly known as Title IX, and particularly section 901(a) of Title IX of the Education Amendments of 1972, Pub. L. 92-318, 86 Stat. 373, 20 U. S. C. § 1681(a), as amended.

## COUNT I

### 42 U.S.C. § 1983

### Violation of 8th Amendment (Official Capacity)

234.   Plaintiff incorporates by reference paragraphs 1 through 233 in this Complaint.

235.   Corizon, Dr. Gams, Nurses Manuel, Gilchrist and Jackson, Chief Gordon, Lt. Young, Lt. Coleman, Warden Stewart and Commissioner Dunn (collectively "these Defendants") are sued in Count I of this Amended Complaint in their official capacities only for prospective injunctive relief.

236.   These Defendants collectively and separately violated Plaintiff's right to remain free from cruel and unusual punishment.

WHEREFORE, Plaintiff demands that the Court enjoin these Defendants and all those acting in concert with them from violating Plaintiff's right to be free from cruel and unusual punishment and to provide such further and such other equitable relief as the Court deems appropriate, including an award of attorneys' fees, expenses and costs as determined by the Court.

## COUNT II

### 42 U.S.C. § 1983

### Violation of 8th Amendment (Individual Capacity)

30

237.   Plaintiff incorporates by reference paragraphs 1 through 233 in this Complaint.

238.   These Defendants (except Commissioner Dunn) are sued in Count II of this Amended Complaint in their individual capacities only.

239.    These Defendants collectively and separately violated Plaintiff's rights to remain free from cruel and unusual punishment.

WHEREFORE, Plaintiff demands compensatory and punitive damages in an amount to be determined by the Jury, an award of attorney's fees and costs, and such other and further relief as the Court deems appropriate.

## COUNT III

### 42 U.S.C. § 1983.

### Violation of the First Amendment (Official Capacity)

240.   Plaintiff incorporates by reference paragraphs 1 through 233 in this Complaint.

241.   These Defendants are sued in Count III of this Amended Complaint in their official capacities only for prospective injunctive relief.

242.   The First Amendment guarantees Plaintiff the right to petition the government for redress of grievances.

243.   Plaintiff petitioned for redress of grievances in the manner prescribed for prisoners at Tutwiler.

244.    Plaintiff also exercised her right to provide evidence in a federal case when she cooperated with the Southern Poverty Law Center in its case challenging the conditions of confinement at Tutwiler.

245.    These Defendants retaliated against Plaintiff because she exercised her rights under the First Amendment.  This retaliation caused Plaintiff to suffer actual physical injury, as well as emotional injury.

WHEREFORE, Plaintiff demands that the Court enjoin these Defendants and all those acting in concert with them from violating Plaintiff's First Amendment rights and such other equitable relief as the Court deems appropriate, including an award of attorneys' fees, expenses and costs as determined by the Court.

## COUNT IV

### 42 U.S.C. § 1983.

### Violation of the First Amendment (Individual Capacity)

246.    Plaintiff incorporates by reference paragraphs 1 through 233 in this Complaint.

247.    These Defendants are sued in Count IV of this Amended Complaint in their official capacities for monetary damages only.

248.    The First Amendment guarantees Plaintiff the right to petition the government for redress of grievances.

249.   Plaintiff petitioned for redress of grievances in the manner prescribed for prisoners at Tutwiler.

250.   Plaintiff also exercised her right to provide evidence in a federal case when she cooperated with the Southern Poverty Law Center in its case challenging the conditions of confinement at Tutwiler.

251.   These Defendants (except Commissioner Dunn) retaliated against Plaintiff because she exercised her rights under the First Amendment.

252.   This retaliation caused Plaintiff to suffer actual physical injury, as well as emotional injury.

WHEREFORE, Plaintiff demands that the Court award Plaintiff compensatory and punitive damages for violating Plaintiff's First Amendment rights and such other relief as the Court deems appropriate, including an award of attorneys' fees, expenses and costs as determined by the Court.

## COUNT V

### Violation of Title IX

253.   Plaintiff adopts and incorporates by reference paragraphs 1 through 233 of this Complaint.

254.   Dunn, as Commissioner of the Department, is sued in Count V of this Amended Complaint in his official capacity only

255.   Dunn is the recipient of federal funding used to finance federally supported programs and activities.

256.   Because the Department's federally funded programs and activities are markedly inferior for women than those provided to similarly situated men, these programs violate Title IX of the Education Amendments of 1972, 28 U.S.C. § 1681, *et seq*.

WHEREFORE, Plaintiff prays this Court will enter a judgment declaring that Dunn, in his official capacity, has violated Title IX and that the Court will further enter injunctive relief such that women prisoners in Alabama will receive the same educational opportunities that men receive, not only with respect to reentry services, but with respect to all other federally funded programs or activities and such other relief as the Court deems appropriate, including an award of attorneys' fees, expenses and costs as determined by the Court.

## COUNT VI

### State Law Claim

### Medical Malpractice

257.   Plaintiff adopts and incorporates by reference paragraphs 1 through 233 of the Complaint.

258.   This claim is brought against Defendants Corizon, Dr. Gams, and Nurses Manuel, Gilchrist, and Jackson only.

259.   The acts and omissions as described herein breached the standard of medical care established within the Montgomery, Alabama medical community and constitute negligence on the part of Tutwiler's medical staff, including Corizon, Dr. Gams and Nurses Manuel, Gilchrist, and Jackson.

260.   As a result of such negligence, Plaintiff was physically injured as recounted herein.

261.   As a result of such negligence, Plaintiff suffered severe physical and emotional injuries, including mental anguish and emotional distress.

WHEREFORE, Plaintiff demands that the Court award Plaintiff compensatory and punitive damages, costs and such other and further relief as the Court deems appropriate.

Respectfully submitted,

/s/ Michele E. Pate
Michele E. Pate (ASB-4457-E49F)
Law Office of Michele E. Pate
P.O. Box 3391
Jasper, AL  35502
(205) 275-1700
mpatelaw@gmail.com

/s/ Frank Ozment
Frank Ozment (ASB-7203-N73J)
Frank Ozment Attorney at Law, LLC
Of Counsel
Fulmar Schudmak, LLC
217 Country Club Park, Box 501

Birmingham, Alabama 35213
(205) 918-8905
frank@fulmershudmak.com


/s/ Andrew C. Allen
Andrew C. Allen (ASB-3867-E56A)
The Law Offices of Andrew C. Allen, LLC
2910 Linden Avenue, Suite 200-B
Homewood, AL  35209
(205) 747-1903
aallen@fulmerschudmak.com

**Attorneys for Plaintiff**


## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Middle District of Alabama using the CM/ECF system, which will provide notification to all counsel of record.


*/s/ Frank Ozment*
Of Counsel