IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TRACEY GRISSOM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-420-RAH-KFP |
| | ) | [WO] |
| CORIZON, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

For four months, Tracey Grissom lived in her own fecal matter. For four months, her feces adhered to and excoriated her skin, it soiled her clothes, it covered her bedding, and it repulsed those around her, so much so that she was segregated from other inmates. This case is about why she lived in such a condition for so long.

Years ago, Tracey Grissom had an ileostomy procedure. Because of this procedure, Grissom must now always wear an ostomy bag on her abdomen that catches redirected fecal matter passing through an artificial opening in her stomach called a stoma. A stoma essentially replaces the anus, and an ostomy bag replaces the toilet. If Grissom does not have a properly fitting ostomy bag attached to her stoma, fecal matter will pour out and onto her body. For the past eight years, Grissom has lived with this condition while incarcerated with the Alabama

Department of Corrections (ADOC) for murder. Several of these years were spent at Tutwiler Correctional Facility in Elmore County, Alabama. While at Tutwiler, Grissom's condition was treated by Defendant Corizon, LLC—the ADOC's medical service provider—and its employees.

In this § 1983 action, Grissom alleges that the Defendants were deliberately indifferent to her serious medical needs in violation of the Eighth Amendment. Specifically, Grissom alleges (1) that she did not timely receive effective ostomy bags, causing fecal matter to excoriate her skin for four months; (2) that she did not timely receive pain medication when she was suffering from abdominal pain related to her ileostomy; and (3) that she was not timely sent to the hospital after her stoma herniated and pushed her intestines three inches outside of her abdomen.

This matter now comes before the Court on motions for summary judgment filed by Corizon, LLC, David Gams, M.D., Linda Gilchrist, Lynda Jackson and Wanda Manuel.[1] These motions have been fully briefed and are ripe for decision. For the following reasons, the motions filed by David Gams, M.D., Linda Gilchrist, and Wanda Manuel are due to be granted in whole; the motions filed by Lynda Jackson and Corizon, LLC are due to be granted in part and denied in part.

## BACKGROUND

---

[1] The parties use "Linda" and "Lynda" Jackson interchangeably. However, the Defendants predominantly use "Lynda." Accordingly, the Court adopts this spelling throughout.

From 2014 through 2018, Grissom was incarcerated at Tutwiler. Prior to her incarceration, and because she had lost total control over her rectum due to injuries she suffered at the hands of her ex-husband whom she later killed,[2] Grissom underwent colectomy and ileostomy procedures to help Grissom regain function over her digestive system. (Doc. 121 at 6.) These procedures diverted Grissom's small intestine to deliver food waste to a hole (a stoma) in her lower stomach.[3] Because Grissom's digestive tract now evacuates from her stoma, she must wear a "pouch" or "ostomy bag" attached to the outside of her abdomen to catch fecal matter and other food waste. While the ileostomy procedure helps Grissom maintain a more sanitary life, Grissom does not have control over when or how waste will pass through her stoma, requiring near constant use of ostomy bags. If Grissom does not have an ostomy bag, or if the bag does not fit properly, fecal matter will leak out of her stoma and onto her skin, clothes, and bedding. If this happens, Grissom's skin can excoriate, causing severe pain and bleeding.

At all relevant times, Corizon provided healthcare-related services to the inmates at Tutwiler, including Grissom. (Doc. 112 at 2.) During this time, Corizon employed Defendant Dr. David Gams as the Medical Director at Tutwiler. (Doc. 112 at 4.) While Dr. Gams was the primary physician regarding Grissom's course

---

[2] Grissom was convicted of murdering her husband after, according to Grissom, he had raped her and caused the injuries that required her to have a stoma.

[3] Colostomies redirect waste from the large intestine, while ileostomies, like Grissom's, redirect waste through the small intestine and require more frequent ostomy bag changes due to more liquified waste.

of treatment, Grissom was also treated by a team of nurses, including three of the Defendants: (1) Director of Nursing Lynda Jackson, R.N.; (2) Linda Gilchrist, R.N.; and (3) Wanda Manuel, R.N.

The allegations in the operative complaint deal with two separate time periods: (1) the days immediately before and after Grissom was sent to the hospital on June 12, 2017, for treatment and surgery for a herniated stoma, and (2) the months after Grissom's surgery.

### A. Pre-Surgery Events

On June 6, 2017, Grissom was suffering from excruciating abdominal pain and was admitted to the infirmary at Tutwiler for suspected kidney stones. (Doc. 121 at 7.) Dr. Gams saw Grissom on June 6 and wrote her a prescription for three-days' worth of Tylenol #4—a prescription pain killer that contains codeine.

Grissom received the Tylenol #4 without issue for the duration of the prescription. However, after the prescription expired, Grissom's pain continued. For nine and half hours on Friday, June 9, Grissom went without Tylenol #4. She asked for Tylenol #4 but the attending nurse—Nurse Gilchrist—refused to dispense any Tylenol #4 for lack of an active prescription. Instead, Gilchrist gave Grissom two other pain medications (Robaxin and Lyrica) for which Grissom had active prescriptions. Grissom alleges that her abdominal pain became increasingly

worse during these nine and a half hours, and eventually, Gilchrist called Dr. Gams and he wrote her a new prescription for Tylenol #4.

On Saturday, Dr. Gams was notified by a nurse that Grissom's stoma had herniated, meaning that her intestines were beginning to protrude several inches outside of her stomach. Dr. Gams told the nurse to continue medication and to monitor Grissom, but not to send her to the hospital. Dr. Gams also said that he would evaluate Grissom on Monday and attempt to reinsert her intestines by hand at that time.

For the next two days, according to Grissom, Grissom laid in agony as her intestines protruded out of her abdomen. She repeatedly asked Nurse Manuel to take her to the hospital; she left her call light on for hours on end with no response; and she told Nurse Manuel several times that her pain was "10 out of 10."  But Manuel did not send Grissom to the hospital. Rather, Manuel monitored Grissom's intestines and determined that the intestines looked healthy and could be treated by Dr. Gams on Monday—as originally planned. Manuel acknowledges that she made the decision to continue monitoring Grissom in lieu of sending her to the hospital. Two experts, as well as Dr. Gams, have declared that this course of action was reasonable in light of the circumstances.

When Dr. Gams arrived on Monday, he attempted to reinsert Grissom's intestines by hand, but failed. Gams then referred her to the hospital. At the

hospital, medical personnel determined that Grissom's intestines had "ischemic changes and some bowel wall hemorrhage" and that surgery was needed.  Grissom then underwent a segmented resection of her ileum, removing parts of Grissom's colon and reinstating her stoma. Grissom was discharged and returned to Tutwiler.

### B. Post-Surgery Events

Grissom's problems continued, however.  After the surgery, Grissom's ostomy bags would not adhere to her stoma, causing feces to leak all over Grissom's bedding, clothing, and skin, causing painful excoriation.  On July 8, 2017, she complained about the bags. Two weeks later, Grissom filed a disability complaint again alleging that the ostomy bags did not fit and led to fecal leakage.

Because one of her nearby bunkmates filed a grievance against her due to the odor, Grissom was assigned to a different bed. Toward the end of the month, the Tutwiler laundry attendant refused to wash Grissom's feces-soiled clothing, thereby leaving Grissom to handwash her soiled clothes, a violation of ADOC policy.

On August 10, 2017, at the direction of Dr. Gams, a wound specialist examined Grissom's stoma. The specialist recommended that Grissom receive a special *deep convex* ostomy bag to prevent leakage and excoriation. The wound specialist subsequently declared that it would be "grossly negligent or willfully indifferent to the well-being of [Grissom]" to fail to "promptly" provide Grissom

with these recommended convex bags. Upon the specialist's recommendation, Dr. Gams promptly directed Nurse Jackson, the Director of Nursing and medical supplies purchaser at Tutwiler, to provide Grissom with the recommended convex bags.  But Jackson did not do so, at least not immediately.  It was not until December that Grissom received the recommended, and properly fitting, convex bags.

Until then, Grissom continued to live with fecal matter on her body and clothing, and she continued to endure skin excoriation. The leakage was so constant, and the excoriation so bad, that Grissom remained bed-ridden to mitigate physical movement that would accelerate the fecal leakage and consequent excoriation. Due to the odor, Grissom was laughed at and shunned by her fellow inmates.

During those four months, Grissom repeatedly asked Nurse Jackson about the convex ostomy bags. Instead of giving Grissom the convex bags, Jackson employed several different types of adhesives, which did not work.

According to Jackson, she attempted to order the bags through McKesson Pharmaceutical, Corizon's preferred vendor, but McKesson was out of stock and unable to fill the convex bag order. And according to Grissom, Jackson told her that the bags had to be ordered from McKesson and that Grissom could only get what was available.  Therefore, since none were available from McKesson,

Grissom had to wait and just deal with it until McKesson was able to fulfill the order.  (Doc. 121-2 at 3.)

In her deposition, Jackson stated that it was Corizon's policy that she could only place supply orders through McKesson.  (Doc. 136-4 at 7.) Jackson further testified that she did not even know how to place a supply order from a vendor other than McKesson.   (Doc. 136-4 at 9.) In a later-filed affidavit, however, Jackson shifted her stance, stating that she could seek supplies from other sources, such as hospitals and pharmaceutical companies, if McKesson could not fill an order.  (Doc. 136-1 at 5–6.)  Further, Jackson's affidavit states that when she first learned McKesson was unable to fill the order for Grissom's convex bags, she and other nurses immediately began contacting other vendors but were unsuccessful because those vendors were also out of stock. It was not until December that Jackson was able to obtain the bags from McKesson.

Grissom's stoma stopped leaking once she received the convex bags. She wears those pouches to this day.

## CLAIM OVERVIEW[4]

In Counts I and II of the operative complaint, Grissom brings § 1983 claims against Corizon, Gams, Jackson, Gilchrist, and Manuel for deliberate indifference to Grissom's serious medical needs.[5]

## JURISDICTION

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to Grissom's federal causes of action, and the Court exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[4] Grissom's operative complaint also brings medical malpractice claims under the Alabama Medical Liability Act, Ala. Code § 6-5-540, et seq.; however, Grissom conceded that these claims are due to be dismissed in her briefing at summary judgment. (Doc. 135 at 20; Doc. 136 at 23; Doc. 137 at 17; Doc. 138 at 19.) Additionally, Grissom brought First Amendment retaliation claims against all the Defendants, but Grissom failed to respond to any of the Defendants' arguments for summary judgment on these claims and has therefore abandoned them. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *see also Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007). Accordingly, the claims in Counts III, IV, and VI of the Complaint are due to be dismissed. Finally, this Court previously dismissed Count V of the operative complaint in a prior opinion. (Doc. 90.)

[5] Also pending before the Court is the Defendants' motion to preclude Grissom's proffered expert from offering standard-of-care expert testimony. (Doc. 110.) Grissom failed to respond to this motion and therefore the motion is due to be granted to the extent is seeks to exclude Kimberly Collins's affidavit. However, the Court notes that this bare affidavit, even if it was considered, would not alter the outcome of this opinion.

judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Just as important, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  In making this assessment, the Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1285 (11th Cir. 1997), and "resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am*., 894 F.2d 1555, 1558 (11th Cir. 1990).

## DISCUSSION

As a threshold matter, Grissom seeks injunctive relief under § 1983 against all the Defendants in their official capacities. But here, all of Grissom's allegations deal with past harms, not ongoing or future harms. Additionally, Grissom is no longer incarcerated at Tutwiler or under the medical supervision of any of the Defendants and she does not specify what injunctive relief regarding her medical condition that this Court should grant against these Defendants. Accordingly,

summary judgment is due to be granted as to all Defendants for the official capacity claims brought in Count I since there is no on-going or continuing violation. *See Nat'l Ass'n of Boards of Pharmacy v. Bd. of Regents of the Univ. Sys. of Georgia*, 633 F.3d 1297, 1308 (11th Cir. 2011) (explaining that a plaintiff can sue a state official in his official capacity for prospective injunctive relief "to prevent a continuing violation of federal law") (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)); *see also Webster v. Altenkirch,* No. 5:18-CV-1339-LCB, 2020 WL 5819678, at *6 (N.D. Ala. Sept. 30, 2020) (same).

The Court now turns to Grissom's individual capacity claims. In Count II, Grissom brings Eighth Amendment claims against each Defendant for deliberately indifferent medical care during the four-month period from June to December. The claim falls into three categories: (1) Jackson and Corizon's failure to timely provide Grissom with convex bags; (2) Gilchrist's failure to provide Grissom with prescription medication; and (3) Manuel's failure to timely send Grissom to the hospital.[6]  When viewing the facts in the light most favorable to Grissom, the Court concludes that for the claims in Count II summary judgment is due to be granted as to Gilchrist and Manuel, but not as to Corizon and Jackson.

---

[6] In Count II, Grissom also brings deliberate indifference claims against Dr. David Gams in his individual capacity. However, unlike for the other four Defendants, Grissom did not respond to Dr. Gams's Motion for Summary Judgment. (Doc. 114.) Accordingly, Grissom has abandoned her claims against Dr. Gams and summary judgment is due in his favor. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007).

## A. Deliberate Indifference to Serious Medical Needs

Grissom brings four separate claims in Count II against Corizon, Jackson, Gilchrist, and Manuel. Each of these claims is governed by the same overarching standard: deliberate indifference to a serious medical need.

Deliberate indifference to the serious medical needs of an inmate constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish a claim for deliberate indifference to a serious medical need, Grissom must show: (1) she had an objectively serious medical need; (2) the defendant acted with deliberate indifference to that need; and (3) causation between that deliberate indifference and her injury. *Wade v. United States*, 13 F.4th 1217, 1225 (11th Cir. 2021); *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019).

An objectively serious medical need is a need "that, if left unattended, poses a substantial risk of serious harm." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)). However, the second element, deliberate indifference, is primarily at issue in this case. To establish deliberate indifference, Grissom must prove three elements: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326–27 (11th Cir. 2007) (quotation and alteration omitted).

Certain situations typically amount to deliberate indifference while others, such as reasonable medical judgment, do not. For example, whether additional or alternative forms of treatment or medication should have been employed "'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle*, 429 U.S. at 107); *see Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) (reiterating "that a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails] to support a claim of cruel and unusual punishment." (internal quotations omitted)); *see also Hamm v. Dekalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1995) (explaining that, where an inmate's health complaints received significant medical care, a mere desire for a different method of treatment does not usually amount to deliberate indifference).

On the other hand, "failing to treat a serious medical need for non-medical reasons constitutes deliberate indifference." *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) ("[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out."). The Eleventh Circuit has repeatedly held that deliberate indifference includes the "delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem, where the

delay does seriously exacerbate the medical problem, and where the delay is medically unjustified." *Fields v. Corizon Health, Inc.,* 490 F. App'x 174, 182 (11th Cir. 2012) (internal quotations omitted). And a conscious decision to "take an easier and less efficacious course of treatment also constitutes deliberate indifferen[ce]." *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *see also Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) (abrogated on other grounds) ("A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.").

With this framework in mind, the Court now turns to Grissom's deliberate indifference claims against each of the Defendants.

### B. Count II - Corizon (Convex Bags)

In Count II, Grissom contends that Corizon, a private medical company on contract with the ADOC, was deliberately indifferent to her serious medical needs by having a policy or custom "of refusing to purchase necessary medical supplies unless those supplies were available for purchase from a single vendor, McKesson Pharmaceutical." (Doc. 135 at 20.) Specifically, Grissom contends that this policy caused the failure to provide Grissom with necessary convex ostomy bags, as ordered by Dr. Gams, which resulted in Grissom being forced to live in her own feces for over four months and her skin to excoriate. Corizon, on the other hand,

argues that it had no such policy or custom and that Grissom has failed to present sufficient evidence to the contrary.

The Court begins with the law. Private companies, like Corizon, may be liable under § 1983 when they "perform[] a function traditionally within the exclusive prerogative of the state" such as providing medical services to persons or inmates. *Craig v. Floyd Cnty.*, F.3d 1306, 1310 (11th Cir. 2011). Liability under § 1983 cannot be based on a theory of vicarious liability. *Id.* Thus, to prevail on her deliberate indifference claim against Corizon, Grissom must show that Corizon had a "policy or custom" of deliberate indifference that led to the violation of her constitutional right to medical care and her injury. *Id.*

"A policy is a decision that is officially adopted by the [company], or created by an official of such rank that he or she could be said to be acting on behalf of the [company]." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). "A policy may be deliberately indifferent if it is facially unconstitutional or where the policy is implemented with deliberate indifference as to its known or obvious consequences." *Fields*, 490 F. App'x at 182. Meanwhile, "[a] custom is a practice that is so settled and permanent that it takes on the force of law." *Id.* That is, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a[n] [entity]

to liability on the theory that the relevant practice is so widespread as to have the force of law." *Craig*, 643 F.3d at 1310.

Thus, to survive summary judgment on this claim, Grissom must show: (1) that Grissom had an objectively serious medical need; (2) that Corizon had a custom or policy that if implemented constituted deliberate indifference to that serious medical need; and (3) that Grissom's injury was caused by the policy's deliberate indifference to her serious medical need. *Wade*, 13 F.4th at 1225; *see also Jackson v. Corizon Health, Inc.*, No. 20-14737, 2022 WL 303288, at *5 (11th Cir. Feb. 2, 2022); *Fields*, 490 F. App'x at 183. And at this procedural stage, Grissom has presented sufficient evidence as to each of these elements.

Grissom has presented evidence showing that Corizon was aware of Grissom's medical condition and also was aware that only convex bags were effective at controlling fecal matter leakage, that a wound specialist recommended the convex bags, and that Dr. Gams approved this recommendation and prescribed the convex bags. But rather than receiving the proper bags as ordered by Dr. Gams, Grissom received alternative bags that did not fit properly. Corizon employees, including Nurse Jackson, were aware that the substitute bags were ineffective because Grissom informed them of such on numerous occasions, both in writing and orally, and because they personally observed it. Indeed, Grissom was isolated due to complaints from other inmates about the stench. Knowing that the substitute

16

bags were ineffective, Jackson gave Grissom various spray and paste adhesives, but these adhesives also failed, and Grissom continued to live with fecal matter constantly leaking onto her skin and clothes for months, despite repeated complaints to Jackson. Because of sustained contact with fecal matter due to the ineffective bags, Grissom's skin excoriated, bled, and she suffered from severe physical pain. Grissom finally received the convex bags four months after they were initially ordered by Dr. Gams. Only then did fecal matter cease to leak out of her stomach and only then did the skin excoriation stop.

Accordingly, Grissom has produced sufficient evidence to create genuine disputes of fact as to whether (1) Grissom had a serious medical need,[7] (2) that Corizon was aware of that need, and (3) that the delay in providing the convex

---

[7] To the extent that the Defendants argue that Grissom's leaking stoma did not pose a serious medical need, such an argument is without merit. Grissom has produced sufficient evidence that skin-excoriating fecal matter on the exterior of her body twenty-four hours a day, seven days a week, for over four months creates a serious medical need and poses a substantial risk of serious harm. *See Aponte v. Suliene*, No. 14-CV-132-JDP, 2016 WL 4539223, at *10 (W.D. Wis. Aug. 30, 2016) ("I cannot say as a matter of law that a leaking ostomy bag is not a serious medical need."); *see also Brooks v. Warden*, 800 F.3d 1295, 1304 (11th Cir. 2015) (collecting cases); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (holding that a serious medical need is one that "if left unattended, poses a substantial risk of serious harm."); *Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) ("It would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days . . . ."). In any event, the Defendants' experts do not say that Grissom's leaking stoma did not present a serious medical need for convex bags; rather, the Defendants' experts repeat the Defendants' go-to tag-line: "Pouches were ordered and provided to Ms. Grissom at Tutwiler. Special convex pouches were not always available but they were ordered and were provided to Ms. Grissom when available." (Doc. 121 at 33.) But it is that precise contention that is in dispute.

bags caused Grissom's harm—that is, constantly living with excoriating fecal matter on her body for over four months and the attendant skin excoriation.[8]

But that alone does not create § 1983 liability for Corizon. Grissom must also provide sufficient evidence to create an issue of fact as to whether Corizon had a custom or policy that, if implemented, constituted deliberate indifference to Grissom's serious medical need for convex bags, and that Grissom's injury was caused by the policy's implementation. *Fields*, 490 F. App'x at 183. And this too Grissom has done.

Grissom has provided Jackson's deposition testimony to evidence Corizon's policy. In her deposition, Jackson testified that she "had to" order supplies from McKesson per Corizon's McKesson-only "policy" (Doc. 135-4 at 7 ("That was Corizon's policy . . . That was their policy.")); that she only ever ordered from McKesson because of the policy; and that she did not even know how to order supplies from other vendors because she exclusively operated pursuant to Corizon's McKesson-only policy. Jackson also testified that she was "sure" that other companies manufactured the bags that Grissom needed, but that she "had to order through" McKesson because of Corizon's McKesson-only policy.

---

[8] The wound specialist, who originally recommended the convex bags but was unaware of whether Grissom actually received them, testified that if the convex bags "were not promptly provided [to Grissom], then that failure was grossly negligent or willfully indifferent to the well being of [Grissom]" due to the "painful" excoriation that is caused by fecal matter on the skin. (Doc. 135-2.)

As such, Jackson's testimony establishes that the four-month delay in procuring the convex bags was a result of the implementation of a Corizon policy to exclusively order from McKesson, and not the result of independent medical judgment. And if that is the case, then Grissom has a claim for deliberate indifference against Corizon. *See Ancata*, 769 F.2d at 704 ("[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out."); *see also Kister v. Quality Corr. Health Care*, No. 20-11537, 2022 WL 3018194, at *5 (11th Cir. July 29, 2022) (per curiam) (holding that if a "no narcotics" policy caused a delay in treatment, then the policy was deliberately indifferent because it is a non-medical policy); *Fields*, 490 F. App'x at 183 (affirming entity liability where the medical entity had a "medically unjustified" policy defining "emergency" too narrowly, which resulted in delayed treatment and injury); *Harper v. Lawrence Cnty.*, 59 F.3d 1227, 1235 (11th Cir. 2010) (holding that "the delay of treatment for obviously serious conditions" where "the delay is medically unjustified" constitutes deliberate indifference).

Despite the Defendants' arguments to the contrary, the absence of a written policy or a showing of circumstantial evidence through comparators is without consequence because Jackson's testimony, alone, constitutes sufficient direct evidence of a Corizon policy, which at least creates a question of fact for resolution by a jury. *See Fields*, 490 F. App'x at 183 (holding that testimony from a nurse

that a policy existed, despite other testimonial evidence to the contrary and the absence of a written policy, was sufficient to establish the existence of a policy); *Kister*, 2022 WL 3018194, at *5 (finding a jury issue as to whether a policy existed even though the plaintiff did not present circumstantial evidence of a pattern of incidents; rather, what mattered was that the plaintiff presented direct evidence that there was in fact a policy); *Mandel*, 888 F.2d at 793 (explaining that evidence of a single decision by a physician's assistant can create entity liability because the physician's assistant had policymaking authority with regards to the subject matter in question); *cf. Jackson*, 2022 WL 303288, at *6 (requiring more than "[p]roof of a single incident of unconstitutional activity" to demonstrate a custom or policy *when* there is no applicable direct evidence of the custom or policy's existence).

Finally, in their summary judgment motions, Jackson and Corizon continually highlight affidavits from Jackson and other staff stating that Jackson could obtain the convex bags from other vendors and that Jackson did in fact call other local hospitals and vendors to try and secure the bags once Jackson discovered that McKesson was of stock.[9] But, as Grissom notes, there is no

---

[9] To the extent the Defendants assert that "other" employees aside from Jackson attempted to purchase the bags from alternative vendors, that assertion is not supported by admissible evidence in the record. First, Nurse Minyard did not testify that she called other vendors herself. Rather, she testified that she understood Jackson was working to find the bags. Second, the Defendants assert that "other" employees called multiple vendors, but these other employees are not mentioned by name. Rather, the Defendants cite to Jackson's affidavit that other employees made calls to local hospitals. But Jackson's declaration alone does not lay a proper foundation to establish that other nameless employees called other vendors to find the convex bags.

documentary evidence of such a policy, and these affidavits contradict Jackson's prior, unequivocal deposition testimony that Corizon did in fact have a McKesson-only policy.[10]

Viewing this contradictory evidence in the light most favorable to Grissom, Jackson's deposition testimony and the subsequently filed affidavits clearly show that there are questions of fact as to (1) whether Corizon had a non-medical policy to exclusively order supplies from a single vendor, even to the delay of treating serious medical needs; and (2) whether the implementation of that policy resulted in Jackson's failure to procure the bags and Grissom's subsequent harm. Of course, a factfinder may determine that the delay in procuring the convex bags was not because of a Corizon policy, or that the delay was the result of an inability to acquire the bags, or that it was because of an independent medical judgment to pursue alternative paths of treatment. But based on the evidence in the record, the Court cannot declare that these material facts are without genuine dispute. *See Kister*, 2022 WL 3018194, at *5 ("[A] factfinder would certainly not be compelled to make such a finding" but "the record is sufficient to create material issues of disputed fact which may not be resolved by the court.").

---

[10] The unexplained contradictions in Jackson's deposition testimony and her subsequently filed affidavit are troubling; but Grissom did not move for the affidavit to be disregarded as a sham and therefore the Court considers the affidavit. *See Santhuff v. Seitz*, 385 F. App'x 939, 944 (11th Cir. 2010) (explaining that an affidavit may be disregarded as a sham if the affidavit "contradicts, without explanation, previously given clear testimony").

Accordingly, at this stage, Corizon is not entitled to summary judgment on the claim for deliberate indifference to a serious medical need due to the existence of a custom or policy.

### C. Count II—Jackson (Convex Bags)

Grissom also brings a deliberate indifference claim against Jackson, the nurse who treated Grissom's leaking stoma, was aware of her condition, and who allegedly failed to seek the convex bags from an outside vendor. For this claim, Grissom contends that Jackson was deliberately indifferent to her medical needs if Jackson made the decision herself to not order the convex bags for Grissom. But Grissom is clear that if Jackson was bound by a Corizon policy that prevented her from ordering convex bags from anyone but McKesson, as she stated in her deposition, then Jackson may not be liable for the failure to order the bags if Jackson did not have policymaking authority over this decision; [11] rather, Corizon would be.

---

[11] Whether Jackson had policymaking authority is not an issue that the Court must decide because the record lacks sufficient evidence to put that issue beyond genuine dispute. After all, Jackson was the Director of Nursing, and she was responsible for ordering ostomy bags at Tutwiler. Based on the evidence in the record, Jackson may have had policymaking authority over supply purchasing. And while "the identification of the final policy maker is a question of [] law for the trial judge, not for the jury," the Court cannot resolve that question of law based on the evidence in the record at present. *Mandel*, 888 F.2d at 793. Rather, Court must hear all the evidence and then decide whether Jackson was a final policymaker as it concerns the subject matter of supply purchasing. *Id.* (explaining that a nurse may be a final policymaker on some subject matters and not on others). If she was a final policymaker for Tutwiler's medical-supply-order policies, then both Corizon and Jackson may be liable.

Jackson argues in her summary judgment motion that Grissom has failed to show that Jackson acted with deliberate indifference to Grissom's serious medical needs. To establish deliberate indifference, a plaintiff must prove three elements: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Goebert*, 510 F.3d at 1326–27 (quotation and alteration omitted).

When the evidence is viewed in the light most favorable to Grissom, Grissom has provided sufficient evidence that Jackson acted with deliberate indifference to Grissom's need as it concerns the convex bags ordered by Dr. Gams.  First, Grissom has presented evidence showing that, over a four-month period, Jackson knew of the risk of serious harm that the absence of the convex bags posed to Grissom, that a wound-specialist had recommended the convex bags, that Dr. Gams had approved this recommendation, that the old bags and Jackson's temporary fixes did not stop constant fecal leakage, and that Grissom repeatedly complained to Jackson about the ineffective bags. Second, Grissom has provided evidence showing that Jackson did not order the needed bags from another vendor, either (1) because she did not want to do so based for non-medical reasons, which would constitute deliberate indifference, or (2) because of a Corizon policy that precluded her from doing so, which would weigh against deliberate indifference unless she had made or created the McKesson-only policy. Indeed, Jackson

testified that she did not, and could not, order the convex bags from anyone other than McKesson due to Corizon's supply-order policies.

Of course, this evidence is called into doubt by Jackson's post-deposition affidavit which asserts that Jackson could, and did, attempt to obtain the convex bags from outside vendors. However, despite Jackson's post-deposition affidavit, the existence of Jackson's contradicting deposition testimony creates a question of fact that precludes the entry of summary judgment in Jackson's favor on the claim for deliberate indifference.

### D. Count II—Nurse Gilchrist (Delayed Prescription Medication)

Separate from Jackson and Corizon, in Count II, Grissom also brings a deliberate indifference claim against Nurse Gilchrist concerning certain medication that Grissom was prescribed by Dr. Gams. Grissom contends that "Nurse Gilchrist violated the Eighth Amendment by refusing to dispense Tylenol #4 or other, equivalent pain medications to [Grissom] for 9.5 hours while [Grissom] endured painful abdominal contractions that caused [Grissom's] intestines to come out [of] her stoma." (Doc. 137 at 15.) Grissom acknowledges however that during the timeframe in question that she did not have an active prescription for the requested pain medication, Tylenol #4. Instead, she argues that Gilchrist should have "simply continued" to dispense Tylenol #4 despite the absence of a prescription.

Gilchrist disputes that she acted with deliberate indifference, stating that she could not give a medication for which there was no prescription and that she did give Grissom alternative medications for which Grissom already had an active prescription. Thus, according to Gilchrist, she is entitled to summary judgment.

Grissom's claim does not evidence deliberate indifference on Gilchrist's part, even in the light most favorable to Grissom. The evidence shows that Gilchrist dispensed pain medication in conformity with Grissom's active prescriptions. And further, at Grissom's request, Gilchrist called Dr. Gams and obtained a new prescription for Tylenol #4, which Gilchrist dispensed to Grissom. In short, the evidence shows that Grissom's claim rests on something that Gilchrist was incapable of doing—that is, giving Grissom a controlled substance without a prescription from a medical doctor. That does not "shock the conscience" and constitute deliberate indifference, especially when Gilchrist could, and did, give Grissom other forms of pain medication that she could permissibly give. *See Keohane,* 952 F.3d at 1266 (holding that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants); *see also Hamm*, 774 F.2d at 1575 (explaining that, where an inmate's health complaints received significant medical care, a mere desire for a different method of treatment does not usually amount to deliberate indifference). Accordingly, summary judgment is due in Gilchrist's favor.

25

### E. Count II—Nurse Manuel (Delayed Hospital Transport)

Finally, in Count II, Grissom also brings a deliberate indifference claim against Nurse Manuel centered upon the day and a half delay in sending Grissom to the hospital for Grissom's prolapsed stoma and intestinal protrusion. Manuel does not contest the serious medical need element of Grissom's deliberate indifference claim, instead contending that Grissom has failed to present sufficient evidence of deliberate indifference and causation.

The Court addresses causation and finds it dispositive. On the causation element, Grissom must present medical evidence demonstrating injury and that the injury suffered was the result of delayed treatment. *See Jackson*, 2022 WL 303288, at *6 (holding that a plaintiff must produce medical evidence "demonstrating that the injuries [she] suffered were the result of delayed treatment"); *see also Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002) (explaining that when a plaintiff alleges that delay in medical treatment constituted deliberate indifference, she "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (same) (overruled on other grounds).

Here, Grissom claims that the delay in hospital transport caused her intestines to become necrotic. However, she has failed to present medical documentation, expert medical testimony, or other objective medical evidence

establishing that the day and a half delay in sending her to the hospital caused her intestines to undergo necrosis, as opposed to some other reason. Grissom has also presented no medical evidence establishing that Manuel's decision to not immediately transport Grissom to the hospital constituted a delay that "would exacerbate the medical problem." *Hill*, 40 F.3d at 1176. While the medical records do confirm that Grissom's intestines became necrotic, there is no evidence that this was caused, or even could have been caused, by the delay. Nor is there evidence that Manuel knew or should have known that a delay in hospitalization over the weekend would or could cause necrosis. *See Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) (holding that liability can attach "if a prison official knows only that, if no action is taken, the detainee faces a substantial risk of serious harm") (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Rather, the Defendants have presented evidence from four medical professionals establishing that Manuel's decision was within the medical profession's standard of care. Specifically, the Defendants' submissions show that Manuel routinely monitored Grissom over the weekend, including numerous inspections of Grissom's protruding intestine, and each time found it to be a healthy pink in color. Manuel, in particular, testified that had the intestine displayed any signs of deterioration, she would have sent Grissom to the hospital. And here, in the absence of such signs, Manuel made the medical decision to

continue to monitor Grissom until Dr. Gams could treat her on Monday—per Gams's original instructions.

While Grissom's evidence from her own testimony does paint a concerning picture about her condition and pain over the weekend, this evidence alone is insufficient to establish causation, let alone that Manuel acted with deliberate indifference. *See Jackson*, 2022 WL 303288, at *6 (requiring causation to be supported by verifying "medical evidence"); *Goebert*, 510 F.3d at 1326–27 (holding that deliberate indifference requires "gross negligence"). Accordingly, lacking genuine disputes of fact as to causation, Nurse Manuel's motion for summary judgment is due to be granted.

## II. <u>CONCLUSION</u>

For the foregoing reasons, it is hereby ORDERED as follows:

1. The Motion for Summary Judgment filed by David Gams (Doc. 114) is GRANTED. The Clerk is DIRECTED to dismiss David Gams as a Defendant in this action.

2. The Motion for Summary Judgment filed by Linda Gilchrist (Doc. 117) is GRANTED. The Clerk is DIRECTED to dismiss Linda Gilchrist as a Defendant in this action.

3.      The Motion for Summary Judgment filed by Wanda Manuel (Doc. 123) is GRANTED. The Clerk is DIRECTED to dismiss Wanda Manuel as a Defendant in this action.

4.      The Motion for Summary Judgment filed by Lynda Jackson (Doc. 120) is GRANTED in part and DENIED in part. The motion is granted as to all claims other than the § 1983 individual capacity claim for deliberate indifference to a serious medical need.

5.      The Motion for Summary Judgment filed by Corizon, LLC (Doc. 111) is GRANTED in part and DENIED in part. The motion is granted as to all claims other than § 1983 individual capacity claim for deliberate indifference to a serious medical need.

6.      The Joint Motion to Preclude filed by the Defendants (Doc. 110) is GRANTED to the extent that it seeks to exclude Kimberly Collins's affidavit.

7.      The claim for deliberate indifference to a serious medical need related to the convex bags contained in Count II shall proceed against Corizon, LLC and Lynda Jackson.

8.      All other claims are dismissed.

DONE, on this the 16th day of September 2022.

_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE